**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

EUGENIA CAMPBELL; and                                                    PLAINTIFFS
DEMETRIUS CAMPBELL

V.                                                         NO. 4:14-CV-00069-DMB-JMV

CITY OF INDIANOLA; MAYOR STEVE
ROSENTHAL, in his individual and official
capacity; CHIEF RICHARD O'BANNON,
in his individual and official capacity; and
OFFICER SCOTT HAGERMAN, in his
individual and official capacity                                         DEFENDANTS

**ORDER GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This removed action arises from an altercation between Indianola Police Officer Scott

Hagerman and Demetrius Campbell after Demetrius arrived on the scene of an automobile

accident involving his grandmother, Eugenia Campbell. Demetrius and Eugenia allege that

Hagerman choked Demetrius without justification or provocation and knocked Eugenia to the

ground in the process, while Hagerman defends that he only used a neck "pressure point"

technique on Demetrius after Demetrius "shoulder-butted" him. Demetrius and Eugenia filed

suit against the City of Indianola ("City"); Steve Rosenthal, the City's mayor; Richard

O'Bannon, the City's police chief; and Hagerman, alleging injuries associated with the

altercation. Doc. #2 at ¶¶ 11–20. Before the Court is Defendants' motion for summary

judgment. Doc. #14. For the reasons below, summary judgment is granted in part and denied in

part.

# I
## Summary Judgment Standard

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 22–23 (1986)).  To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor."  *Norwegian Bulk Transp. A/S*, 520 F.3d at 411–12 (internal quotation marks omitted).  To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact."  *Id.* at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case."  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted).  If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate."  *Id.*  In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (citation and internal punctuation omitted).  When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Relevant Facts

### A. Accident and Altercation

At "a little after 12" p.m. on July 23, 2013, Eugenia was rear-ended while at the intersection of Garrett and Wiggins Road in Indianola, Mississippi. Doc. #14-5 at 3. Following the collision, Eugenia called the police who, in turn, dispatched Indianola Police Officer Scott Hagerman to the scene of the accident. *Id*.

At some point after arriving on the scene, Hagerman informed Eugenia and the driver of the other automobile that they were "free to go." Doc. #14-5 at 3. At approximately the same time, Demetrius arrived in a car driven by Shondell Davis.[1] *Id*. at 14–15. Davis pulled up to the scene in such a way as to block traffic. *Id*. at 15. Hagerman told Davis, "Get the car out of my investigation." *Id*. at 3. Davis, heeding Hagerman's instructions, backed the automobile away from the accident scene. *Id*.

While Hagerman spoke with Davis, Demetrius exited the vehicle, approached Eugenia, and asked whether she was alright. Doc. #14-5 at 3, 10. After Eugenia responded that she was "okay," Demetrius walked to the rear of Eugenia's automobile "to see [the] damage to the truck." *Id.* at 3, 12. Upon observing Demetrius, Hagerman asked, "[W]ho are you," and then told Demetrius to "[g]et out of my investigation." *Id* at 3. Demetrius "proceeded to come around in the front of … Hagerman" and responded, "Officer, I just came to check on my grandmother." *Id*. at 3–4. About the same time, Demetrius moved back toward his grandmother. Doc. #14-5 at 11, 15.

---

[1] Demetrius identified this man as his cousin. Doc. #14-5 at 10. Hagerman identified the man as Shondell Davis. *Id*. at 14–15.

The circumstances surrounding Demetrius' move toward his grandmother are disputed by the parties. Hagerman testified that, while walking toward Eugenia, Demetrius "shoulder-butted" him and said, "I don't have to tell you shit, that's my grandma." Doc. #14-5 at 15. Eugenia testified that Demetrius did not "bump" into Hagerman and that "he didn't do anything."[2] *Id*. at 7. In any event, Hagerman then put his hands on Demetrius' chest and pushed him onto the truck. *Id*. at 10. Demetrius responded by asking, "[W]hy are you being so aggressive?" *Id*. at 4, 10.

At this point, Eugenia observed Hagerman "grab [Demetrius] around his neck and like shoved him up against the truck and start[] choking him." *Id*. at 4. Hagerman described this technique as "not … a choke hold, but … what they call pressure point technique." *Id*. at 15. According to Hagerman, his intention in employing this technique was "[t]o find out who [Demetrius] was and to arrest him."[3] *Id*.

After observing one of Demetrius' eyes "g[e]t larger than the other one," Eugenia started crying, "Jesus, Jesus, Jesus, Jesus," and attempted to get between Demetrius and Hagerman. *Id*. at 4. During this altercation, Hagerman "shoved" Eugenia with his arm or elbow, knocking her to the ground. *Id*. Hagerman testified that he did not intentionally push Eugenia and that he did not notice her fall. *Id*. at 16. As a result of Eugenia's intervention, Demetrius was able to free himself from Hagerman's grasp and take off running away from the scene. *Id*. at 16.

Hagerman caught up with Demetrius, "placed him in a head lock" and took him to the ground. *Id*. at 11, 16. According to Demetrius, Hagerman then placed his hands around

---

[2] For purposes of reviewing the summary judgment issues, the Court resolves this factual dispute in favor of the nonmoving parties – Plaintiffs. *See Little*, 37 F.3d at 1075.

[3] Hagerman explained, "At that point, [Demetrius] was going to be under arrest for failure to comply because instead of walking away, he continued toward [a]nd when he shoulder-butted me, he assaulted me." Doc. #14-5 at 16.

Demetrius' neck, "squeezing tighter and tighter choking me."[4]   *Id.* at 11.   Around this time, another officer arrived and placed handcuffs on Demetrius.   *Id.*   Hagerman continued to choke Demetrius even after the handcuffs were secured.   *Id.*

### B.   Arrest and Subsequent Legal Proceedings

Shortly after the altercation, Demetrius was arrested on three charges:  (1) trespass after notice of non-permission; (2) disorderly conduct – failure to comply with officer; and (3) resisting arrest – minor.[5]   Doc. #14-2.   The same day, Demetrius filed a criminal affidavit against Hagerman.   Doc. #14-4.   In the affidavit, Demetrius alleged that Hagerman "purposely, knowingly and unlawfully cause [sic] bodily injury to Demetrius Campbell by grabbing him around the throat and choked [sic] him at the intersection of Garrard and Wiggins."   *Id.*

On November 4, 2013, Sunflower County Circuit Judge Richard A. Smith convened a probable cause hearing on two criminal complaints brought against Hagerman – one brought by Demetrius (2013-0054), and one brought by Eugenia (2013-0053).[6]   Doc. #14-5 at 1–2.   At the hearing, Judge Smith heard testimony from Hagerman, Demetrius, and Eugenia.   Doc. #14-5. The witnesses were questioned by Gary Austin, on behalf of the State; and Francis Springer, on behalf of Hagerman.   *Id.*

The following day, on November 25, 2013, Judge Smith issued an order in 2013-0054 (Demetrius' case) stating, in relevant part:

---

[4] Included in Defendants' exhibits supporting their motion for summary judgment is an exhibit consisting of a series of photographs showing a man in a police uniform with his elbow around the neck of an African American male wearing a red shirt.   Doc. #14-7.   While Hagerman's deposition testimony establishes that Demetrius was wearing a red shirt at the time of the incident, there is no indication on the record what these photographs purport to reflect.   In the absence of such evidence, this exhibit is of no evidentiary value.

[5] Interestingly, the arrest report states that the arrest was made by "Warrant."   Doc. #14-2.   Defendants themselves have referred to Demetrius' arrest as "warrantless."   Doc. #15 at 11.

[6] While the record includes only a criminal affidavit filed by Demetrius against Hagerman, the transcript of the probable cause hearing, which includes two docket numbers, reflects that Eugenia also made an allegation against Hagerman.   *See* Doc. #15-4 at 3.

This Court, having heard evidence in open court from the Petitioner [Demetrius Campbell] and his mother, Eugenia Campbell, and Scott Hagerman, finds the following:

> a. Scott Hagerman was an acting sworn law enforcement officer on July 23, 2013 and was acting within the scope of his duties as law enforcement officer at the subject time and place;

> b. No proof evidenced an attempt to cause or purposely, knowingly or recklessly cause any bodily injury to Demetrius Campbell ….

[T]here is not sufficient probable cause for a warrant to be issued against Scott Hagerman for simple assault.

Doc. #14-6. The record does not reveal how, if at all, the complaint brought by Eugenia (2013-0053) was resolved.

On April 14, 2014, in Indianola Municipal Court, Demetrius was found guilty of "Failure to Obey Officer – Minor" and "Resisting Arrest (Minor)." Doc. #14-3. The conviction for failure to obey resulted in a fine of $181.00 and assessments of $153.25, while the conviction for resisting arrest resulted in a fine of $286.00 and assessments of $153.25. *Id.*

Demetrius appealed his convictions to the Circuit Court of Sunflower County, Mississippi. On April 1, 2015, the Sunflower County Circuit Court issued an order reversing the judgment of the Municipal Court. Doc. #27-4. In the same order, the Circuit Court entered a not guilty verdict on each charge. *Id.*

### C. Procedural History

On April 17, 2014, Eugenia and Demetrius filed a complaint in the Circuit Court of Sunflower County. Doc. #2. The complaint names as Defendants: (1) the City of Indianola; (2) Steve Rosenthal, the Mayor of the City of Indianola, in his individual and official capacities; (3) Richard O'Bannon, the Chief of the City's Police Department, in his individual and official capacities; and (4) Hagerman, in his individual and official capacities. *Id.*

On May 15, 2014, Defendants, asserting the existence of federal question jurisdiction, removed the state court action to this Court. Doc. #1. On September 25, 2014, Defendants filed a motion for summary judgment seeking dismissal of "all Defendants with prejudice."[7] Doc. #14 at 3. After seeking and receiving a short extension, Plaintiffs responded to the motion for summary judgment on October 16, 2014. Doc. #21. Defendants replied seven days later. Doc. #22.

On April 17, 2015, Plaintiffs filed an unopposed motion to supplement their response by "adding Not Guilty Verdicts and Deposition transcripts …." Doc. #25. Four days later, on April 21, 2015, this Court granted Plaintiffs' motion. Doc. #26.

On April 28, 2015, Plaintiffs filed seven new exhibits and a supplemental brief in opposition to the motion for summary judgment.[8] Doc. #28. Without leave of this Court, Defendants filed a supplemental reply, a supplemental memorandum, and supplemental exhibits.[9] Doc. #30; Doc. #31.

---

[7] Defendants' motion for summary judgment does not expressly ask for the dismissal of all claims but such is logically inferred from their request that the Court "dismiss[] all Defendants with prejudice." Doc. #14 at 3.

[8] Except for small formatting changes, two short references to the reversals of the convictions, and a handful of citations, the supplemental brief is identical to Plaintiffs' original responsive brief in opposition. *Compare* Doc. #28 *with* Doc. #21. In addition to the supplemental brief, Plaintiffs submitted seven exhibits: (1) the first page of Judge Smith's Order Regarding Probable Cause, Doc. #27-1; (2) an Incident Report from the Indianola Police Department detailing Eugenia's allegations against Hagerman, Doc. #27-2; (3) the Notice of Appeal filed by Demetrius following his convictions, Doc. #27-3; (4) the Circuit Court of Sunflower County's order reversing Demetrius' convictions, Doc. #27-4; (5) the first four pages of a transcript of an April 1, 2015, deposition of Hagerman, Doc. #27-5; (6) the first four pages of an April 1, 2015, deposition of O'Bannon, Doc. #27-6; and (7) the same series of photographs submitted by Defendants, Doc. #29. But for the Circuit Court's order, and the deposition transcripts, Plaintiffs' supplemental exhibits exceed the scope of this Court's order allowing supplementation of the record. *See* Doc. #26. It is arguable that the filing of a supplemental brief (rather than just supplemental exhibits) exceeded the scope of this Court's April 21, 2015, order. Nevertheless, out of an abundance of caution, the Court considered Plaintiffs' supplemental brief in deciding Defendants' motion for summary judgment. However, for purposes of deciding the motion for summary judgment, this Court declines to consider the unauthorized exhibits. *See Rashid v. Delta State Univ.*, __ F.R.D.__, 2015 WL 1774416, at *4 (N.D. Miss. Apr. 17, 2015) (court may decline to consider unauthorized filing).

[9] Except for the concession of a point of argument described below in footnote 12, the Court declines to consider Defendants' unauthorized supplemental reply, memorandum, and exhibits. *See Rashid*, 2015 WL 1774416, at *4.

III
Scope of Complaint and Motion for Summary Judgment

Plaintiffs' complaint asserts six counts: (1) a claim for injunctive relief against all Defendants (Count One); (2) a claim for "Negligent, Grossly Negligent, and Wanton Failure in Hiring and to Monitor, Train, and Supervise the Officers Involved" against O'Bannon and the City (Count Two); (3) a claim for intentional infliction of emotional distress against all Defendants (Count Three); (4) a claim for assault and battery against Hagerman (Count Four); (5) a claim for "Violation of Federal Due Process, Equal Protection, Civil Rights Laws Under 42 U.S.C. Section 1983 and 28 U.S.C. Section 1343 et al" against all Defendants (Count Five); and (6) a claim for "Excessive Force" against all Defendants based on violations of the "Fourth Amendment protection against excessive force" (Count Six).[10]  Doc. #2.  In addition, Plaintiffs seek punitive damages from all Defendants.  *Id*. at ¶ 43.

While the caption of the complaint lists O'Bannon, Rosenthal, and Hagerman as defendants in their individual and official capacities, the specific causes of action do not specify which claims are brought in which capacities.  In the absence of any evidence to the contrary, the Court, in deciding the motion for summary judgment, presumes that the causes of action against them in the complaint are brought in both individual and official capacities.[11]  *See Valdez v. City*

---

[10] Although Count Six's "Excessive Force" claim does not reference § 1983, the Court interprets Count Six as a § 1983 action.  *See Saddler v. Quitman Cty. Sch. Dist.*, No. 2:05-cv-218, 2007 WL 2287838, at *5 (N.D. Miss. Aug. 3, 2007) ("§ 1983 is the exclusive federal damages remedy for the alleged violation of federal constitutional rights by person acting under color of state law.") (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 704 (1989)); *see also Martin v. Dunaway Food Servs.*, No. 5:14-cv-21, 2015 WL 518709, at *4 (S.D. Miss. Feb. 6, 2015) ("The Court construes these [constitutional] claims under 42 U.S.C. § 1983 even though Martin does not specifically cite the statute.") (citing *Johnson v. City of Shelby*, __U.S.__, 135 S.Ct. 346, 347 (2014)); *see also Foster v. Michigan*, 573 Fed. App'x 377, 391 (6th Cir. 2014) ("[W]e have long held that § 1983 provides the exclusive remedy for constitutional violations.") (citing *Thomas v. Shipka*, 818 F.2d 496, 503 (6th Cir. 1987)).

[11] "In the Fifth Circuit … if it is not clear from the allegations of the complaint whether a defendant has been sued in his official or individual capacity, the court must look to the substance of the claims, the relief sought, and the course of the proceedings to determine in which capacity the defendant is sued."  *Senu-Oke v. Jackson State Univ.*, 521 F.Supp.2d 551, 556 (S.D. Miss. 2007).  The Court is skeptical whether such an inquiry is necessary where a complaint, at least in the caption, specifically names defendants in both capacities.  However, since neither party has addressed this issue, the precise nature of Plaintiffs' claims will be left for a later day.

*of New York*, No. 11 Civ. 05194, 2013 WL 8642169, at *16 n.14 (S.D.N.Y. Sep. 3, 2013) ("Although, in each count against Taylor, Plaintiff does not actually specify whether he is seeking relief from Taylor in his individual or official capacity, Plaintiff has named all of the Individual Defendants in both their individual and official capacities, in the caption of his Third Amended Complaint.").

Also, although Defendants' motion for summary judgment seeks dismissal of all Defendants, Doc. #14, Defendants' memorandum brief raises only four arguments: (1) that Judge Smith's finding on the assault charge against Hagerman is preclusive here; (2) that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars Demetrius' § 1983 excessive force claims;[12] (3) that Hagerman is entitled to qualified immunity under federal law; and (4) that the "supervisory claims" against the City and O'Bannon fail. The motion does not address any of Plaintiffs' state law claims or the claims brought against O'Bannon and Rosenthal in their individual capacities.[13] Accordingly, summary judgment against such claims will be denied.

## IV
## Impact of Probable Cause Determination

As a preliminary matter, Defendants contend that, under the doctrine of collateral estoppel, this action is controlled by Judge Smith's finding that there was no probable cause to

---

[12] Defendants have withdrawn this argument. Doc. #30 at 2–3.

[13] In their reply brief, Defendants argue that Plaintiffs' "State Law Claims are barred by the police protection exemption of the [Mississippi Tort Claims Act]." Doc. #22 at 5. This argument, which was not raised in the motion for summary judgment or Defendants' initial brief, is deemed waived. *See Jones v. Cain*, 600 F.3d 527, 540 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived."). Additionally, Defendants offered no argument for applying federal qualified immunity to the state law claims. Accordingly, the Court declines to consider this issue. *See Small v. McCrystal*, 708 F.3d 997, 1010 n.4 (8th Cir. 2013) (declining to apply federal qualified immunity to state law claims where defendant "cites no authority that extends the defense of qualified immunity to state-law claims"). Even if the qualified immunity argument had been raised, it likely would have been rejected. *See Kermode v. Univ. of Miss. Med. Ctr.*, No. 3:09-cv-584, 2010 WL 2683095, at *5 (S.D. Miss. July 2, 2010) ("At least one decision from a Mississippi court has explained that qualified immunity does not apply to state law claims.") (citing *Suddith v. Univ. of S. Miss.*, 977 So.2d 1158, 1169 (Miss. Ct. App. 2007)).

believe that Hagerman attempted to cause, or knowingly or recklessly caused, any bodily injury to Demetrius.  Doc. #15 at 6–10.

"In principle, the law of collateral estoppel is clear; in application, it can be a slippery concept indeed." *U.S. v. Mock*, 604 F.2d 341, 343–44 (5th Cir. 1979).  In its most basic form, collateral estoppel bars "litigation of an issue previously decided in another proceeding by a court of competent jurisdiction ...." *Copeland v. Merrill Lynch & Co., Inc.*, 47 F.3d 1415, 1421–22 (5th Cir. 1995).  "[U]nder the Full Faith and Credit Act[, 28 U.S.C. § 1738], a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give." *Shimon v. Sewerage & Water Bd. of New Orleans*, 565 F.3d 195, 199 (5th Cir. 2009).  Thus, "§ 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments.  Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken." *Id.*  Insofar as Defendants seek to invoke collateral estoppel arising from a Mississippi state court judgment, the Court will look to Mississippi state law in determining the judgment's preclusive effect.[14]  *Id.*; *see also Allen v. McCurry*, 449 U.S. 90, 96 (1980) ("[I]ssues actually litigated in a state court proceeding are entitled to the same preclusive effect in a subsequent federal § 1983 suit as they enjoy in the courts of the state where the judgment was rendered.").

Under Mississippi law, "[w]hen collateral estoppel is applicable, the parties will be precluded from relitigating a specific issue [1] actually litigated; [2] determined by, and [3] essential to the judgment in a former action, even though a different cause of action is the subject

---

[14] Defendants cite a Fifth Circuit opinion in which the Court of Appeals applied federal law in determining the preclusive effect of a Mississippi state administrative judgment.  *See* Doc. #15 (citing *Holmes v. Jones*, 738 F.2d 711, (5th Cir. 1984)).  *Holmes*, which relied on the analysis of a state *administrative* proceeding is inapplicable here. *See generally Frazier v. King*, 873 F.2d 820, 823–24 (5th Cir. 1989) ("In *University of Tennessee v. Elliott*, 478 U.S. 788 (1986), the Supreme Court held that federal common law rules of preclusion incorporate state issue preclusion rules in a federal suit brought after a state administrative adjudication arising from the same facts.").

of the subsequent action." *Hollis v. Hollis (Upton)*, 650 So.2d 1371, 1377 (Miss. 1995). Additionally, "a fourth prerequisite must also be met for collateral estoppel to apply. 'A final decision of an issue on its merits is normally thought of as preclusive only if there is an identity of parties from one suit to the next, and of their capacities as well.'" *Id.* at 1378 (quoting *State ex rel. Moore v. Molpus*, 578 So.2d 624 (Miss. 1991)). "The parties do not have to be the exact parties that litigated the former action." *Baker & McKenzie, LLP v. Evans*, 123 So.3d 387, 401–02 (Miss. 2013). Rather, the identity requirement is met so long as the two parties were in privity. *Id.* at 402. "For a nonparty to be considered in privity, the nonparty must be connected with the former action in their interests and be affected by the judgment with reference to interest involved in the action, as if they were parties." *Id.* (quoting *Little v. V & G Welding Supply, Inc.*, 704 So.2d 1336, 1339 (Miss. 1997) (internal brackets and quotation marks omitted).

As a general rule, courts have held that the party asserting collateral estoppel bears the burden of establishing the doctrine's requirements. *See Anderson, Clayton & Co. v. U.S.*, 562 F.2d 972, 992 (5th Cir. 1977) ("[T]he party seeking collateral estoppel effect has the burden of proving this to be so"); *RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1261 (Fed. Cir. 2003) ("The party seeking to invoke collateral estoppel bears the burden to prove all necessary elements."). While it appears Mississippi courts have not explicitly addressed which party bears the burden of proof in a general collateral estoppel inquiry, the Mississippi Supreme Court has held that the party asserting the existence of a sufficient identity of parties bears the burden of establishing such identity, *Evans*, 123 So.3d at 401–02;[15] and that "[t]he burden of proving res judicata as a defense is on the defendant," *Anderson v. LaVere*, 895 So.2d 828, 832 (Miss. 2004). Given that the same court has held that "[c]ollateral estoppel is very similar to res

---

[15] "[I]f the nonparty can prove that he was in privity with the parties in the former action, then collateral estoppel may be applied." *Evans*, 123 So.3d at 401-02.

judicata," *Channel v. Loyacono*, 954 So.2d 415, 425 (Miss. 2007), the Court presumes that Mississippi courts would follow the general rule and place the burden of proving the applicability of collateral estoppel on the party asserting it.

Here, Defendants have offered no argument or evidence that Demetrius or Eugenia were (or are) in privity with either the State or Hagerman (the two parties in the probable cause hearing).  *See generally Sciarrone v. Brownlee* (*Matter of Brownlee*), 83 B.R. 836, 839–40 (Bankr. N.D. Ga. 1988) ("The plaintiff in the case at bar was neither a party to nor in privity with a party to the criminal proceeding, for the prosecution represented the State of Georgia, not the victim or the plaintiff.  Therefore, the plaintiff is not bound by the verdict"); *see also Tidwell v. Booker*, 225 S.E.2d 816, 826 (N.C. 1976) (no privity between state and plaintiff because, although "plaintiff … swore out the warrant which initiated the criminal prosecution against the defendant and, presumably, was a witness for the State … [s]he was not … in control of the prosecution.").  In the absence of such a record, the Court must conclude that Defendants have failed to satisfy the fourth requirement for collateral estoppel under Mississippi law and that, therefore, application of the doctrine here is inappropriate.  Thus, Judge Smith's probable cause determination has no bearing on this summary judgment inquiry.

## V
## Injunctive Relief Request (Count One)

Count One of Plaintiffs' complaint states, in relevant part: "The Plaintiffs are entitled to, and hereby request, an injunction prohibiting the Defendants from committing conduct of the like, kind, character and nature as that demonstrated and described in this complaint at any time in the future within the jurisdiction of the Circuit Court of Sunflower County, Mississippi."  Doc. #2 at ¶ 22.  Neither Defendants' motion for summary judgment nor their accompanying briefs address the claim for injunctive relief.  However, the Court has "an independent obligation to

determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

Injunctive relief claims, even those removed from state court, are subject to the jurisdictional standing requirement of Article III. *Machlan v. Procter & Gamble Co.*, __ F.Supp.3d __, 2015 WL 106385, at *3–4 (N.D. Cal. Jan. 7, 2015) (finding plaintiffs lacked Article III standing to maintain state injunctive relief claim even though "[t]he result in a California state court would likely be different"). "In order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003).

"Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects." *Id.* at 358. Thus, to satisfy the Article III standing requirement for injunctive relief arising from a past wrong, "a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future." *Id.*

Here, there is nothing in the record which would suggest that Plaintiffs currently are suffering injury from the conduct they seek to enjoin (the alleged excessive use of force during accident investigations) or that they are likely to suffer injury from this practice in the future. Accordingly, Plaintiffs will be directed to, within fourteen days of the issuance of this order, show cause why their claim for injunctive relief should not be dismissed or remanded[16] for lack of jurisdiction. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("That Lyons may

---

[16] *See Machlan*, 2015 WL 106385, at *4.

have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.").

## VI
## Qualified Immunity Issue Regarding Hagerman

Defendants argue that "Officer Hagerman is entitled to qualified immunity." Doc. #15 at 11. "Qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lytle v. Bexar Cty.*, 560 F.3d 404, 409 (5th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To determine whether a government official is entitled to qualified immunity for an alleged constitutional violation, [courts] conduct [the] two-step analysis of *Saucier v. Katz*, 533 U.S. 194 (2001)." *Lytle*, 560 F.3d at 409 (internal citations omitted). First, the Court must "ask the threshold constitutional violation question of whether, taking the facts in the light most favorable to the plaintiff, the officer's alleged conduct violated a constitutional right." *Id.* at 409–10. If there was no constitutional violation, the "inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity." *Id.* If, however, the officer violated a constitutional right, the Court must "ask the 'qualified immunity question' of whether the right was clearly established at the time of the conduct." *Id.*

## A. Constitutional Violation

Count Five of Plaintiffs' complaint, captioned "Violation of Federal Due Process, Equal Protection, Civil Rights Laws Under 42 U.S.C. Section 1983 and 28 U.S.C. Section 1343 et al," states in full:

> 34.  The plaintiffs incorporate and adopt all prior paragraphs, averments, and statements.
>
> 35.  Plaintiffs would show unto the Court that the Defendants, with reckless disregard for Plaintiffs' rights, took actions to deprive Plaintiffs of their due process rights and equal protection rights.
>
> 36.  Plaintiffs suffered damages as a result of the aforementioned conduct as set out heretofore and/or hereinafter.

Doc. #2 at ¶¶ 34–36.  As pled, Count Five fails to identify which rights, if any, form the basis of the cause of action.  However, in their memorandum in response to the motion for summary judgment (as well as in the nearly identical supplemental memorandum), Plaintiffs clarify that Count Five's claim is based on the "right to be free from state-occasioned damage to a person's bodily integrity … protected by the Fourteenth Amendment guarantee of due process."  Doc. #28 at 10; Doc. #21 at 10.  Additionally, in Count Six, Plaintiffs plead that "Defendants took actions to deprive Plaintiffs of their Fourth Amendment protection against excessive force."  Doc. #2 at ¶ 38.  Accordingly, two constitutional rights appear to be at issue – the Fourth Amendment's prohibition against unreasonable seizures, which applies to the states through the Fourteenth Amendment; and the Fourteenth Amendment's due process protections against excessive force.[17]

"Where … the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons against

---

[17] In their memorandum brief, Defendants argue that "Hagerman's warrantless arrest of Demetrius does not violate the Fourth Amendment because probable cause existed to arrest."  Doc. #15 at 11.  A warrantless arrest claim does not appear on the face of the complaint and is not advanced in either of Plaintiffs' responsive memoranda.

unreasonable seizures of the person." *Graham v. Connor*, 490 U.S. 386, 3994 (1989) (punctuation and quotation marks omitted). Thus, "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard' rather than under a 'substantive due process approach.'" *Id*. at 395 (emphasis in original).

However, "where a plaintiff's excessive force claim, whether he be a prisoner, arrestee, detainee, or an innocent bystander of tender years, falls outside the specific protections of the Bill of Rights, that plaintiff may still seek redress under the due process clause of the Fourteenth Amendment." *Petta v. Rivera*, 143 F.3d 895, 911 n.25 (5th Cir. 1998) (citing *Graham*, 490 U.S. at 395 n.10). Under this framework, where a plaintiff raises potential violations under the Fourth and Fourteenth Amendments, a Court should first consider whether the claim falls within the ambit of the Fourth Amendment – that is, whether it arises in the course of an arrest, investigatory stop, or other seizure of a free citizen. *Graham*, 490 U.S. at 393–94. If so, the claim should be analyzed under Fourth Amendment jurisprudence. *Id*. If not, the claim should be analyzed as a due process violation under the Fourteenth Amendment. *Petta*, 143 F.3d at 911 n.25.

### 1.  Force Used Against Demetrius

There can be no serious dispute that Demetrius' excessive force claim arises in the context of an arrest or investigatory stop of a free citizen. Accordingly, the Fourth Amendment's reasonableness standard applies. *Graham*, 490 U.S. at 393–95.

"[T]he reasonableness of official use of force turns on a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

countervailing government interests at stake." *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 626 (5th Cir. 2006). "In assessing the governmental interest at stake, [courts] are guided by the "*Graham* factors," which 'include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether she was actively resisting arrest or attempting to evade arrest by flight.'" *Singleton v. Darby*, __ Fed. App'x __, 2015 WL 2403430, at *9 (5th Cir. May 21, 2015) (Dennis, J., dissenting) (quoting *Gonzalez*, 459 F.3d at 626); *see also Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003) ("We … assess the importance and legitimacy of the government's countervailing interests, mindful of the three factors the Supreme Court identified in *Graham* ….").  "The standard is objective reasonableness under the totality of the circumstances." *Byrd v. City of Bossier*, 23 F.Supp.3d 665, 670 (W.D. La. 2014) (citing *Graham*, 490 U.S. at 396); *see also Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015) (citing *Graham* and applying objective standard to pre-trial detainee's due process claim).  Thus, while the *Graham* factors are illustrative of "the types of objective circumstances potentially relevant to a determination of excessive force," the Supreme Court does "not consider this list to be exclusive." *Kingsley*, 135 S.Ct. at 2473.

Viewed in the light most favorable to the nonmoving parties, the record reflects that: (1) Demetrius arrived at the scene of the accident; (2) Hagerman inquired who Demetrius was and told Demetrius to leave the scene; (3) rather than leave the scene, Demetrius approached Hagerman and said that he was just checking on his grandmother; (4) Demetrius turned away from Hagerman; (5) Hagerman placed his hand on Demetrius' chest and pushed him against the truck; (6) Demetrius asked, "[W]hy are you being so aggressive?;" (7) Hagerman placed Demetrius in a choke hold or "pressure point" hold around Demetrius' neck; (8) the hold continued until Eugenia intervened in the altercation, allowing Demetrius to escape Hagerman's

hold; (9) Demetrius fled from Hagerman on foot; (10) Hagerman caught up with Demetrius and placed him in a head lock; (11) Hagerman "slammed" Demetrius to the ground and began "choking" him; (12) Hagerman continued choking Demetrius even while Demetrius kept his hands behind his back, remained passive, and was eventually handcuffed; and (13) Hagerman's choking of Demetrius continued after the handcuffs were secured.

In their responsive brief, Plaintiffs wholly fail to articulate which activities of Hagerman constituted excessive force against Demetrius. Rather, Plaintiffs merely claim that "Hagerman … viciously attack[ed] Plaintiff Demetrius, and ultimately, forcefully shove[d] Plaintiff Eugenia to the ground." Doc. #21 at 11; *see also id.* ("Certainly, relatives should be allowed to check on each other without being viciously attacked by police officers."). However, Plaintiffs' complaint alleges that "unprovoked, Defendant Hagerman violently grabbed Plaintiff … slammed him to the ground, and choked him." Doc. #2 at ¶ 16. Accordingly, the Court may evaluate Demetrius' excessive force allegation based on Hagerman's grabbing of Demetrius, Hagerman's taking Demetrius to the ground; and Hagerman's choking of Demetrius. *See generally Tracey v. Freshwater*, 623 F.3d 90, 96–97 (2d Cir. 2010) ("Tracy's complaint can be read to allege that Officer Freshwater exceeded Fourth Amendment constraints in four different ways: first, by striking Tracy with a flashlight several times; second, by jumping on Tracy as Tracy, by his own admission, attempted to flee from Freshwater; third, by spraying Tracy with pepper spray after Tracy had already been placed in handcuffs; and fourth, by forcibly moving Tracy from the ground to the police car despite the fact that Tracy had told Freshwater that he was in pain and could not move."); *see also Curtis v. Hinds Cty.*, No. 3:12-cv-260, 2014 WL 4773973, at *4 (S.D. Miss. Sep. 24, 2014) (considering restraint and lifting by restraints as separate allegations of excessive force).

Where, as here, multiple allegedly excessive acts took place during a single encounter, the proper course is to begin the excessive force analysis with the earliest allegation of excessive force because a single act of excessive force is sufficient to state a claim under § 1983. *See Rasmussen v. City of New York*, 766 F.Supp.2d 399, 405–06 (E.D.N.Y. 2011) ("[I]f in fact the police used excessive force in gratuitously attacking Ivan and in continuing to beat him after he was handcuffed and subdued, then it does not matter if the handcuffing itself or the gunshot constituted excessive force; the jury will already have found the police liable for excessive force."); *see also Morfin v. City of East Chicago*, 349 F.3d 989, 1004 (7th Cir. 2003) ("Mr. Morfin did not resist arrest in any way prior to the officers' use of excessive force."). Thus, the Court will begin its analysis by considering, under *Graham*, the reasonableness of Hagerman's initial grabbing of Demetrius.

### a. Severity of Crime at Issue

As a general matter, "the arresting charges against the plaintiff are often the appropriate basis for determining the 'severity of the crime at issue'." *Shannon v. Koehler*, No. C 08-4059, 2011 WL 10483363, at *10 (S.D. Iowa Sep. 16, 2011) (collecting cases). However, *Graham* makes clear that the reasonableness inquiry is limited to "the facts and circumstances confronting" the officer. 490 U.S. at 397. Thus, where an officer has no reason to believe that a crime has been committed, such crime will not influence the reasonableness inquiry. *See Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (ignoring crime from reasonableness inquiry where officer "had no reason to believe" crime had been committed). When considering the severity of a crime under *Graham*, courts will normally consider the inherent violence of the offense. *See Schmidt v. Texas*, No. 08-cv-1696, 2009 WL 7808953, at *11 (S.D. Tex. Aug. 17, 2009) ("Plaintiff's crime, driving while intoxicated, was quite serious, but not inherently

violent."); *see also Ray v. City of Columbus*, No. 1:09-cv-213, 2011 WL 3629225, at *3 (N.D. Miss. Aug. 17, 2011) ("Plaintiff's crime, trespassing, was not inherently violent.").

According to Hagerman, Hagerman attempted to arrest Demetrius based on Demetrius' failure to comply with Hagerman's instructions, and Demetrius having assaulted Hagerman when he allegedly hit Hagerman with his shoulder. Plaintiffs do not dispute that Hagerman had a reasonable belief that Demetrius, at the time of the grabbing, had committed the crime of disorderly conduct. *See* Miss. Code Ann. § 97-35-7.[18] However, it is clear that failure to comply with Hagerman's instructions (which instructions occurred first in the sequence of events between Hagerman and Demetrius) was not inherently violent.

As to assault, drawing every reasonable inference in favor of Plaintiffs, the Court concludes, for the purpose of this motion, that Demetrius did not bump Hagerman. In the absence of such contact, the Court is skeptical how Hagerman could have formed a reasonable belief that an assault had occurred. *See* Miss. Code Ann. § 97-3-7(1)(a) ("A person is guilty of simple assault if he … attempts to cause or purposely, knowingly or recklessly causes bodily injury to another …."). Even if Hagerman had a reasonable belief that the shoulder bump occurred, there is no indication Hagerman suffered injury, fell to the ground, or even moved at all as a result of the alleged bump. Put differently, the "violence" of the purported assault was so benign as to be virtually meaningless. Under these circumstances and viewing the facts in the light most favorable to Demetrius, the Court concludes that the first *Graham* factor weighs against the use of force.

---

[18] "Whoever, with intent to provoke a breach of the peace, or under such circumstances as may lead to a breach of the peace, or which may cause or occasion a breach of the peace, fails or refuses to promptly comply with or obey a request, command, or order of a law enforcement officer, having the authority to then and there arrest any person for a violation of the law, to …. Move or absent himself and any vehicle or object subject to his control from the immediate vicinity where the request, command or order is given …." Miss. Code Ann. § 97-35-7.

### b. Threat to Officers or Others

The Fifth Circuit has treated the second *Graham* factor, whether the plaintiff posed a threat to the safety of officers or others, as the most important question in the reasonableness inquiry. *See Rockwell*, 664 F.3d at 992 ("[N]either the Supreme Court nor this Court has ever held that all of the Graham factors must be present for an officer's actions to be reasonable; indeed, in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others."). Defendants argue that Demetrius "began to threaten physical harm to Hagerman, and made deliberate shoulder-to-shoulder contact with him." Doc. #15 at 2.

First, Defendants have not shown how, if at all, Demetrius "began to threaten physical harm to Hagerman." To the contrary, no explicit threat appears in the record. Furthermore, while Hagerman testified that Demetrius "shoulder[-]butted" him while walking back toward Eugenia, there is, as described above, a genuine issue of material fact as to whether such contact occurred. Even if Hagerman had a reasonable belief that the alleged contact occurred, there is no indication that Hagerman had reason to believe that the shoulder-butt was intentional, much less threatening. *See Dinan v. Multnomah Cty.*, No. 3:12-cv-00615, 2013 WL 324059, at *11 (D. Or. Jan. 28, 2013) (declining to find that plaintiff posed immediate threat where plaintiff "pushed [officer's] arm away while stepping away from officer" because "the degree and immediacy of such a potential threat was far from certain"). Finally, any threat from the perceived shoulder butt is undercut by the undisputed evidence that Demetrius was walking away from Hagerman. *See Oliver v. Holmes Cty.*, No. 3:12-cv-683, 2013 WL 4039392, at *7 (S.D. Miss. Aug. 7, 2013) (plaintiff suspected of non-violent crime did not pose immediate threat to officer or others while

walking away after being told he was under arrest).  Under these circumstances, the Court concludes that the second factor weighs against the use of force.

### c.  Resisting Arrest

The third *Graham* factor requires the Court to consider whether the plaintiff was "actively resisting arrest or attempting to evade arrest by flight."  Here, there is no dispute that, at the time Demetrius was grabbed, there was no objective indication that Hagerman intended to initiate an arrest.  Accordingly, Demetrius, who is not reasonably expected to know of Hagerman's unarticulated desire to initiate an arrest, could not have resisted arrest or attempted to evade arrest by flight.  However, where a person refuses to obey an officer's order, such refusal carries a "suggest[ion] that he might try to resist or escape." *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009).

Demetrius does not dispute that he refused to comply with Hagerman's instruction to leave the scene of the accident.  Insofar as this refusal carried a suggestion that he might try to resist or escape, the third *Graham* factor weighs slightly more than not in favor of the use of force.

### d.  Scope of Intrusion and Balancing

"The gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to the type and amount of force inflicted." *Singleton*, 2015 WL 2403430, at *9 (citing *Tennessee v. Garner*, 471 U.S. 1, 7–9 (1985)); *see also Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003) ("[W]e assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted.").  In making this determination, a Court may consider the extent of injury, if any, suffered by the plaintiff. *See Peters v. City of Biloxi*, 57 F.Supp.2d 366, 374 (S.D. Miss. 1999)

("[T]he absence of physical injury is a factor that may signify that the force was not excessive, and it should be considered with the totality of other circumstances.") (citing *Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir. 1998)); *see also Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012) ("The degree of injury suffered, to the extent it tends to show the amount and type of force used … is also relevant to our excessive force inquiry.").

Drawing every reasonable inference in favor of Plaintiffs, the record shows that Hagerman pushed Demetrius against the truck and then choked him with such force that one of Demetrius' eyes increased in size. The choking continued until Eugenia intervened. Hagerman's actions were severe in both quantity and quality, and thus represent a significant intrusion of Demetrius' liberty interest. *See Griffith v. Coburn*, 473 F.3d 650, 657 (6th Cir. 2007) (noting that evidence showed pressure point control tactic "vascular neck restraint falls toward the harder or more violent part' of [the force] continuum, probably beyond pepper spray [to] the point where you are using batons or tasers") (internal punctuation omitted). This significant intrusion far outweighs the minor governmental interest implicated by the *Graham* factors.[19] As such, considering all inferences in Plaintiffs' favor, Hagerman violated Demetrius' Fourth Amendment rights.

---

[19] In *Martin*, the principal case relied on by Defendants, the plaintiff, Dorothy Heard, observed a traffic stop occurring outside the daycare center she owned. 2012 WL 329155, at *1. Heard approached the traffic stop and was told to leave by the on-scene officer. *Id.* Shortly after, Heard attempted to approach the traffic stop and was again told to leave. *Id.* After the arrival of additional officers, the original officer approached the daycare center. *Id.* As the officer approached, Heard yelled something from the doorway and, in response, the officer "grabbed and twisted Heard's arm in an attempt to effectuate an arrest for disorderly conduct and interfering with a traffic stop. During his attempt to arrest Heard, [Heard's] grandson, Channing, was standing beside Heard and fell hitting his head." *Id.*

Heard and her grandson filed claims for excessive force. *Id.* at *3–4. In granting summary judgment for the officer on Heard's claim, U.S. District Judge Sharion Aycock noted that "[b]oth parties acknowledge that [the officer] grabbed Heard's arm in his attempt to arrest her. Heard testified that [the officer] reached for his handcuffs and grabbed her arm …. The force used in this case was reasonable." *Id.* at *4. As to the grandson's claim, Judge Aycock held that there was "no evidence from which to infer that Officer Chandler intended to exercise any force against the one year old child …. Accordingly, Plaintiffs' excessive force claim fails as to [the grandchild] as well." *Id.*

## 2. Force Used Against Eugenia

As explained above, "[a] bystander's right to be free from a law enforcement officer's use of excessive force springs from the unreasonable seizure clause of the Fourth Amendment or from the due process clause of the Fourteenth Amendment." *Teames v. Henry*, No. 3:03-cv-1236, 2004 WL 2186549, at *6 (N.D. Tex. Sep. 29, 2004) (citing *Graham*, 490 U.S. at 395; and *Petta*, 143 F.3d at 911 n.25). "Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful. This is implicit in the word 'seizure,' which can hardly be applied to an unknowing act." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989) (internal citations omitted).

In *Martin*, the principal case relied upon by Defendants as described in footnote 19 above, U.S. District Judge Sharion Aycock granted summary judgment in favor of an officer on an excessive force claim brought by a minor who was struck and fell during an altercation between the officer and the minor's grandmother. 2012 WL 329155, at *3–4. In so holding, Judge Aycock observed that the plaintiff had failed to put forth evidence that the "fall was attributable to any action on the part of Officer Chandler, or that even if it was Chandler's fault [that] Chandler's actions were intentional." *Id*. at *4.

Here, as in *Martin*, Plaintiffs have put forth no evidence that the contact between Hagerman and Eugenia, if any, was intentional.[20] In the absence of such evidence, the Court

---

Although the *Martin* opinion cited to *Graham*, it did not conduct a step-by-step analysis of the *Graham* factors. In the absence of such analysis, it is difficult to apply the *Martin* holding to the excessive force claim at issue here.

[20] The evidence shows that the contact between Hagerman and Eugenia occurred after, and only because, Eugenia attempted to get between Hagerman and Demetrius.

cannot conclude that Eugenia was seized within the meaning of the Fourth Amendment. Therefore, a Fourteenth Amendment analysis is appropriate.

"Under the Fourteenth Amendment standard, the court must consider whether the defendants' 'actions caused [plaintiff] any injury, were grossly disproportionate to the need for action under the circumstances and were inspired by malice rather than merely careless or unwise excess of zeal so that [they] amounted to an abuse of official power that shocks the conscience.'" *Hayes v. Woods*, No. 1:12-cv-215, 2013 WL 5936384, at *5 (S.D. Miss. Nov. 1, 2013) (quoting *Petta*, 143 F.3d at 902). Due to the malice requirement, Fourth Amendment claims failing for lack of intent will also fail as Fourteenth Amendment due process claims. *See e.g., Serrato v. City of Harlingen*, No. Civ. A. B-05-323, 2006 WL 510010, at *6 (S.D. Tex. Mar. 1, 2006), *amended on reconsideration in part,* 2006 WL 1310382 (S.D. Tex. May 12, 2006) ("Thus, if the Plaintiffs can prove that Officer Reyna acted with malice, the claim will be covered by the Fourth Amendment, and the substantive Due Process claim will not be available. If the Plaintiffs cannot prove that Officer Reyna acted with malice in choosing to collide with the Serratos' vehicle, then Plaintiffs will not be able to establish the requisite minimal mens rea for a Substantive Due Process claim."). Insofar as there is no evidence here that Hagerman acted with intent (much less malice) in allegedly striking Eugenia, Eugenia's excessive force claims must fail.

## B. Qualified Immunity

Having found at this summary judgment stage that Hagerman subjected Demetrius to a constitutional violation, the Court must next address whether Hagerman is nonetheless entitled to qualified immunity. Within the excessive force context, if a court:

> finds that [an] officer's conduct was not reasonable under the Fourth Amendment, [it] must then answer the qualified immunity question by determining whether the

law was sufficiently clear that a reasonable officer would have known that his conduct violated the constitution. In other words, at this second step, [the Court] must ask the somewhat convoluted question of whether the law lacked such clarity that it would be reasonable for an officer to erroneously believe that his conduct was reasonable.

*Lytle Cty.*, 560 F.3d at 410.

In the Fifth Circuit, "[i]t is beyond dispute that [a person's] right to be free from excessive force during an investigatory stop or arrest was clearly established in August 2007." *Newman v. Guedry*, 703 F.3d 757, 763–64 (5th Cir. 2012). Similarly, since at least 2007, it has been clear that, where an arrestee poses no threat to the officers or anyone else, "the use of [a] neck restraint … violates a clearly established constitutional right to be free from gratuitous violence during arrest and is obviously inconsistent with a general prohibition on excessive force." *Griffith*, 473 F.3d at 659–60.

In invoking qualified immunity, Hagerman relies almost exclusively on the Fifth Circuit's unpublished opinion of *Dawson v. Anderson County*, 566 Fed. App'x 369 (5th Cir. 2014).[21] Doc. #22 at 1–2. In *Dawson*, the plaintiff, while in custody at a county jail, refused two search requests to "squat and cough." 566 Fed. App'x at 370–71. In response to these refusals, an officer shot the plaintiff twice with a pepperball gun – once in the leg and once in the abdomen. *Id*. On appeal, a divided panel held that "[m]easured force used on an arrestee who refuses immediately successive search orders cannot be deemed objectively unreasonable under

---

[21] Defendants also cite to *Brooks v. City of West Point*, 18 F.Supp.3d 790 (N.D. Miss. 2014), in which Judge Aycock found qualified immunity in a warrantless arrest and excessive force cause of action. First, as described above, Plaintiffs have not asserted a claim for warrantless arrest. Second, the excessive force claim in *Brooks*, which involved officers tackling the plaintiff as he "mov[ed] fast" from his home after being informed he was under arrest and wrestling the plaintiff as he "attempt[ed] to cause bodily injury" to one of the officers, bears no similarity to this case. *Id*. at 796–97.

our qualified immunity caselaw."  *Id.*  *Dawson*, which is not binding on this Court,[22] is distinguishable for a number of reasons.

First, the *Dawson* opinion rested on the statement of law that "[l]aw enforcement officers are within their rights to use objectively reasonable force to obtain compliance from prisoners," *id.* at 370 (citing Eighth Amendment case law), inapplicable here because Demetrius was not a prisoner.  More importantly, there is absolutely no indication that Demetrius, like the plaintiff in *Dawson*, refused "immediately successive search orders."  Even if a refusal to clear an accident scene could be considered analogous to a search order, Hagerman's own testimony reveals that he only issued Demetrius one directive to leave the scene (with which Demetrius complied) before utilizing the excessive force.  Doc. #14-5 at 15.  For these reasons, the Court finds *Dawson* distinguishable from this matter.

As explained above, there is a genuine issue of material fact as to whether Demetrius posed a threat to Hagerman or anyone else.  Accordingly, viewed in the light most favorable to Demetrius, Hagerman's use of a pressure-based neck restraint violated a clearly established constitutional right; thus, qualified immunity on the excessive force claim is inappropriate.[23] *Griffith*, 473 F.3d at 659–60.

---

[22] *See* 5th Cir. R. 47.5.4 ("Unpublished opinions issued on or after January 1, 1996, are not precedent, except under the doctrine of res judicata, collateral estoppel or law of the case …"); *see also U.S. v. Johnson*, 619 F.3d 469, n.3 (5th Cir. 2010) ("Although unpublished cases from this court rendered after January 1, 1996, and decisions from other circuit courts are not controlling precedent, they may be considered persuasive authority.") (citing Rule 47.5.4).

[23] Having determined that Demetrius has created a genuine issue of material fact as to the use of excessive force in the encounter, the Court need not consider at this juncture whether the factual events following the unconstitutional seizure amounted to excessive force.  *See Rasmussen*, 766 F.Supp.2d at 405–06.  Although not reached, viewed against *Graham*, Hagerman's continued choking of Demetrius after Demetrius was handcuffed on the ground weighs heavily against the use of force.  Although this occurred after Demetrius fled the scene, reasonable inference indicates that Demetrius fled the scene to escape Hagerman's grip.  Moreover, there certainly can be no justifiable reason Hagerman's choking persisted after Demetrius was on the ground with his hands handcuffed behind his back, at which point he could not have been a threat to Hagerman.  However, even if Hagerman's ensuing actions were not excessive, liability for such actions may still attach.  *See Flores v. City of Palacios*, 381 F.3d 391, 391 (5th Cir. 2004) (injuries caused by excessive force occurring later in time recoverable); *see also Farmer v. Parker*, No. 3:12-CV-00489, 2014 WL 690728, at *7 (M.D. Tenn. Feb. 21, 2014) ("A reasonable factfinder could conclude that it was

Section 1983 provides for liability against a municipality for causing "a constitutional tort, which occurs when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008). Similarly, a plaintiff may bring a § 1983 claim based on a municipal official's failure to adequately hire, train, or supervise employees if such failure amounts to deliberate indifference to the rights of others. *See Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (training and supervising); *see also Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (hiring). Additionally, pursuant to the Mississippi Tort Claims Act, Miss. Code. Ann. §§ 11-46-1, et seq., a plaintiff may assert Mississippi state law claims for damages arising from a municipality or municipal's official negligence in hiring, training, or supervising employees. *See Bridges v. Pearl River Valley Water Supply Dist.*, 793 So.2d 584, 586–87 (Miss. 2001) (analyzing under MTCA negligent supervision, hiring, and training claims brought against supervisor and municipality).

As stated above, Plaintiffs have pled claims for violation of the Fourteenth Amendment's protection against the use of excessive force (Count Five), for violation of the Fourth Amendment's protection against the use of excessive force (Count Six), and for negligence in hiring, supervision, and training (Count Two). *See* Doc. #2. While Counts Five and Six (the § 1983 claims) are asserted against all Defendants, Count Two is brought against only the City and O'Bannon. *See* Doc. #2 at ¶¶ 23–25.

---

reasonably foreseeable that, once Parker unnecessarily provoked a physical confrontation and Farmer reasonably turned to evade the assault, another correctional officer would attempt to assist Parker by conducting a physical takedown of Farmer. Therefore, the court finds that there is a material issue of disputed fact as to whether Parker's use of excessive force proximately caused any injuries that Farmer sustained from Sergeant Farley's leg sweep").

In their summary judgment memorandum, Defendants argue that "Plaintiffs' Supervisory Claims Against Indianola and Chief O'Bannon Fail as a Matter of Law." Doc. #15 at 15. In support of this statement, Defendants, citing § 1983 case law, argue that Plaintiffs have failed to satisfy the requirements for municipal liability because they have not identified a policymaker and have failed to prove an unconstitutional official policy or custom.[24] *Id.* at 15–18. Plaintiffs' response, which argues that "Defendants Indianola and O'Bannon are liable for their failure to supervise pursuant to the MTCA," seems to reflect a belief that Defendants' motion relates to Count Two, not the § 1983 claims. Doc. #21 at 12. In their reply, Defendants repeat that summary judgment is warranted on the § 1983 claims and, for the first time, contend that Plaintiffs' "State Law Claims are barred by the police protection exemption of the MTCA." Doc. #22 at 4–5.

As explained above, Defendants' initial memorandum did not seek dismissal of Plaintiffs' state law claims. Accordingly, the argument relating to the police protection exemption of the MTCA is deemed waived.

Turning to municipal liability under § 1983, "[i]n order to hold a municipality liable under § 1983 for its employees' acts, a plaintiff must show that a policy [or custom] of hiring or training caused those acts. Such a showing requires proof that (1) the training or hiring procedures of the municipality's policymaker were inadequate, (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy, and (3) the

---

[24] The structure of Defendants' argument tracks the analysis for municipal liability under § 1983, but does not address the elements of individual liability under the statute. See *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010) ("Municipal liability under Section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom."). Indeed, the subsections of the municipal liability section specifically refer to "City Liability." *See* Doc. #15 at 16–17. Nevertheless, while the individual liability supervisory claims are not properly before the Court, given Eugenia's failure to establish a constitutional violation, her supervisory claims are unlikely to survive to trial. *See Manton v. Strain*, No. 09-0339, 2010 WL 4364552, at *7 (E.D. La. Oct. 21, 2010) ("Absent the existence of a predicate constitutional violation, Strain cannot be held liable either individually or in his official capacity for the acts of his subordinates.") (collecting cases).

inadequate hiring or training policy directly caused the plaintiffs' injury." *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996). Defendants argue that the § 1983 claims must fail because there is no evidence of an unconstitutional policy or custom related to hiring, supervision, or training. Doc. #15 at 17–18. In response, Plaintiffs have not introduced any evidence which would tend to show that the City's hiring, supervising, or training procedures were (or are) inadequate under § 1983. Indeed, Plaintiffs have not responded to the § 1983 supervisory arguments at all. Accordingly, summary judgment will be granted on the § 1983 claims brought against the City. Furthermore, insofar as "[o]fficial capacity suits are another way of pleading an action against an entity of which an officer is an agent," *Renfro v. City of Kaufman*, 27 F.Supp.2d 715, 716 (N.D. Tex. 1998) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)), summary judgment will also be granted on the § 1983 claims brought against Rosenthal, Hagerman, and O'Bannon as agents of the City.[25]

## VIII
## Conclusion

For the reasons above, Defendants' motion for summary judgment [14] is **GRANTED in Part and DENIED in Part**. The motion is granted to the extent it seeks dismissal of: (1) Demetrius' § 1983 claims against the City and against Rosenthal, O'Bannon, and Hagerman in their official capacities; (2) Eugenia's § 1983 claims against the City and against Rosenthal, O'Bannon, and Hagerman in their official capacities; and (3) Eugenia's § 1983 claims against Hagerman in his individual capacity. The motion is denied as to: (1) Demetrius' § 1983 claim

---

[25] While the memorandum brief did not specifically address the official capacity claims against Rosenthal or Hagerman, "where the Court grants summary judgment in a particular party's favor, it can also grant summary judgment *sua sponte* in favor of another party who is entitled to judgment as a matter of law assuming it is based on the same determinative issues." *Reese v. Monroe Cty. Sheriff's Dep't*, at *7 (N.D. Miss. Mar. 27, 2008) (citing *Chrysler Credit Corp. v. Cathey*, 977 F.2d 447 (8th Cir. 1992)).

against Hagerman in his individual capacity; (2) the state law claims; and (3) in all other respects.

Furthermore, Plaintiffs are **DIRECTED** to, within fourteen (14) days of the issuance of this order, show cause why Count One of their complaint should not be dismissed or remanded for lack of standing.

SO ORDERED, this 24th day of July, 2015.

**/s/ Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**